UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARRIE MCCLUSKEY, et al.,

                Plaintiffs,

vs.

BELFORD HIGH SCHOOL, et al.,

                Defendants.

_____/

Civil Action No.
09-CV-14345

HON. MARK A. GOLDSMITH

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND DENYING AS MOOT PLAINTIFFS' MOTION TO COMPEL DISCOVERY

## I. INTRODUCTION

This is a purported class action involving claims for breach of contract, fraud, misrepresentation, promissory estoppel, unjust enrichment, RICO, and civil conspiracy. The named Plaintiffs are Carrie McCluskey, Evelyn Reisdorff, and Jaime Yanez (collectively, "Plaintiffs"). Plaintiffs sue numerous entities and individuals; however, only two have appeared in this action thus far: Defendants Belford High School and Belford University (collectively, "Belford").

Plaintiffs allege that Belford operates a fraudulent Internet scheme involving the alleged sale of sham high school diplomas and university degrees. Specifically, Plaintiffs allege that Belford operates Internet websites on which it falsely represents that it is an accredited and legitimate high school and university, whose diplomas and degrees will be widely accepted by employers, professional associations, and universities. Plaintiffs are adults who obtained allegedly illegitimate high school diplomas or degrees through Belford's websites.

1

Now before the Court is Belford's motion to dismiss for lack of personal jurisdiction and Plaintiff's motion to compel discovery. The matters are fully briefed and the Court heard oral argument on December 2, 2010. For the reasons that follow, both motions will be denied.

## II. BACKGROUND

The three named Plaintiffs—McCluskey, Reisdorff, and Yanez—are residents of Michigan, Arizona, and California, respectively. Second Am. Compl. ¶¶ 5-7. Plaintiffs allege, on information and belief, that Belford is a corporation located in Texas. *Id*. ¶¶ 8-9.[1]

Salem A. Kureshi is Belford's managing coordinator. Kureshi Decl. ¶ 2.[2] In his declaration, Kureshi testified as follows regarding Belford's lack of contacts with Michigan:

- Belford is located in Panama. *Id*. ¶ 3.

- Belford has no officers, agents, or employees located in Michigan, nor have any such officials ever traveled to, or conducted business in, Michigan. *Id*. ¶ 5.

- Belford has never advertised in Michigan, nor has it targeted Michigan residents in its advertising. Rather, Belford buys ads on Google's search engine, which can be accessed by anyone in the world with Internet service. *Id*. ¶¶ 6, 20.

- Belford has websites that are managed by an e-commerce company that is located outside the United States and then outsourced to different companies in the United States, none of which is located in Michigan. *Id*. ¶ 19.

- Belford does not possess property, real or tangible, in Michigan. *Id*. ¶ 15.

- Approximately 10% of Belford students reside in the United States, and approximately 0.16% reside in Michigan. *Id*. ¶¶ 8-9.

- Plaintiff McCluskey, the only named Plaintiff residing in Michigan, initially contacted

---

[1] Belford's citizenship is irrelevant because the Court possesses federal question jurisdiction over this matter based on Plaintiffs' RICO claim.

[2] Kureshi's declaration dated August 19, 2010 is attached as Exhibit 1 to Belford's motion to dismiss.

Belford via Belford's website as part of the student registration/enrollment process. Belford did not solicit or initiate contact with McCluskey. *Id.* ¶ 10.

• After Plaintiff McCluskey initially contacted Belford, it responded to McCluskey's inquiry by calling her on the telephone in Michigan. The call was made by a Belford agent located in Southeast Asia. *Id.* ¶¶ 11-12.

• In addition, Belford mailed one piece of correspondence to McCluskey in Michigan. This correspondence was mailed from outside the United States. *Id.* ¶¶ 11, 13.

• Belford has never consented to personal jurisdiction in Michigan. *Id.* ¶ 21.

• The "Terms of Service" section on Belford's websites provides that the student's relationship with Belford is governed by the laws of Panama. *Id.* ¶ 24.

Plaintiffs attach to their response brief the declarations of eight individuals, all of whom are Michigan residents who received purported high school diplomas or university degrees from Belford. The eight individuals are: (1) Plaintiff Carrie McCluskey, (2) Deborah Collins, (3) Kris Russell, (4) Annette Anderson, (5) Marvin Grace, (6) Jerard McMillon, (7) William Mazur, and (8) Karyn Thompson.[3] Their interactions with Belford are detailed below.

## 1. Plaintiff Carrie McCluskey

Plaintiff McCluskey, a Michigan resident, testified that she conducted a search on the Internet for "high school diploma" (or words to that effect) from her home in Michigan and was led to Belford's website. McCluskey Decl. ¶¶ 1-4. The website "invited" McCluskey to take an online "equivalency test" on Belford's website, which she completed. *Id.* ¶¶ 6-7. McCluskey then received a telephone call from a Belford representative at her Michigan home. *Id.* ¶ 7. The agent informed McCluskey that she had passed the equivalency test and that all that was needed before she could receive her diploma was payment. *Id.* The agent also advised McCluskey that colleges across the

---

[3] Individuals (2) through (8) are currently non-parties to this litigation.

country would accept a Belford diploma.  *Id.*  McCluskey provided her credit card details to the representative over the phone.  *Id.* ¶ 8.  Thereafter, McCluskey received a diploma in the mail from Belford.  *Id.* ¶¶ 9-10; Tab 1 (copy of diploma).  The diploma was shipped to McCluskey's home in Michigan.  *Id.* ¶¶ 9-10.  McCluskey applied for admission to Baker College, but was told that her Belford diploma was invalid.  *Id.* ¶¶ 11-12.

### 2. Deborah Collins

Collins, a Michigan resident, testified that she conducted a search on the Internet for "online high school" (or words to that effect) from her home in Michigan and was led to Belford's website. Collins Decl. ¶¶ 1-4.  Collins called the phone number listed on Belford's website and spoke to a Belford representative in order to obtain further information regarding a Belford diploma.  *Id.* ¶ 6. The Belford representative told Collins to take an online equivalency test on Belford's website.  *Id.* ¶¶ 7-8.  While taking the online test, Collins received a phone call from a Belford representative who advised Collins that Belford was running a "special" and that she could receive a diploma at a reduced price.  *Id.* ¶ 9.  The representative suggested that Collins discontinue the test and instead enter certain personal information on Belford's website, which Collins did. *Id.* ¶¶ 9-10.  Collins then received emails and phone calls from Belford, at her Michigan home, encouraging her to provide her payment information so that she could receive her diploma.  *Id.* ¶ 10.  During one phone call, a Belford representative advised Collins that if she paid that day, she would receive a reduced rate. *Id.* ¶ 11.  Collins provided her debit card number on an account held at a Michigan-based credit union.  *Id.*  Belford, via EducationSP.com, debited $201.69 from Collins' account.  *Id.* ¶ 12; Tab 1 (copy of bank statement evidencing debit).  Collins subsequently received an email from Belford with log-in and password information, allowing her personalized access to Belford's website.  *Id.*

¶ 14; Tab 2 (copy of email). Collins received her diploma in the mail thereafter, which was shipped to Collins' address in Michigan. *Id*. ¶¶ 16-17; Tab 4 (copy of shipping label); Tab 5 (copy of diploma).

Collins subsequently applied for admission at Grand Rapids College and Colorado Technical University, but was told by both institutes that her diploma was invalid. *Id*. ¶¶ 18-19. Thereafter, Collins returned to Belford's website, from her home in Michigan, where she initiated a live online chat session with Belford representative John Smith. *Id*. ¶ 20. Collins told Smith, via the website's online chat function, that her Belford diploma had been rejected by the institutions to which she had applied. *Id*. Smith responded that "Belford High School diplomas are generally accepted by institutions across the globe" because "they are awarded by a recognized High School which is fully accredited." *Id*. ¶ 20; Tab 6 (transcript of online conversation between Collins and Smith).

### 3. Kris Russell

Russell, a Michigan resident, testified that she conducted a search on the Internet for "high school diploma" (or words to that effect) from her home in Michigan and was led to Belford's website. Russell Decl. ¶¶ 1-4. Russell supplied her name and contact information by way of Belford's website, and completed the equivalency test. *Id*. ¶ 6. After completing the online test, Russell received a telephone call, at her home in Michigan, from a Belford representative, who informed Russell that she had passed the test and that all that was needed before she could receive her diploma was payment. *Id*. ¶ 7. Russell provided her credit card information to the representative over the phone and subsequently received her diploma in the mail. *Id*. ¶¶ 8-10; Tab 1 (copy of diploma). The package containing Russell's diploma was shipped to her home in Michigan. *Id*. ¶ 9. Thereafter, Russell applied to Baker College, but was told that her Belford diploma was invalid.

*Id.* ¶¶ 11-12.

### 4. Annette Anderson

Anderson, a Michigan resident, testified that she conducted a search on the Internet for "GED" (or words to that effect) from her home in Michigan and was led to Belford's website. Anderson Decl. ¶¶ 1-4. Anderson supplied her name and contact information over Belford's website. *Id.* ¶ 5. After supplying her personal information, Anderson received a phone call from a Belford representative, who advised her that all she needed to do in order to receive her diploma was provide payment. *Id.* ¶ 6. Anderson provided her credit card information over the phone and subsequently received a diploma in the mail. *Id.* ¶¶ 6-8; Tab 1 (copy of diploma). The diploma was shipped to Anderson at her home in Michigan. *Id.* ¶¶ 7-8. Thereafter, Anderson applied to the University of Phoenix, but was told that her high school diploma was invalid. *Id.* ¶¶ 9-10.

### 5. Marvin Grace

Grace, a Michigan resident, testified that he conducted a search on the Internet for "GED" (or words to that effect) from his home in Michigan and was led to Belford's website. Grace Decl. ¶¶ 1-4. Grace called the phone number listed on Belford's website and spoke to a Belford representative in order to obtain further information. *Id.* ¶¶ 5-6. The representative advised Grace to take an online equivalency test, accessible through Belford's website, which he did. *Id.* ¶ 7. Grace also inputted and submitted personal information, and paid for a diploma using a credit card, via Belford's website. *Id.* ¶ 8. Belford sent two emails to Grace confirming the order and payment. *Id.* ¶ 9; Tab 1 (copies of two emails from Belford to Grace). Grace subsequently received a diploma in the mail. *Id.* ¶ 10; Tab 2 (copy of diploma). The diploma was shipped to Grace at his home in Michigan. *Id.* ¶ 10.

Prior to obtaining a Belford diploma, Grace had been offered a job at Hutzel Hospital in Detroit, contingent upon obtaining a high school diploma. *Id.* ¶ 12. Grace provided a copy of his Belford diploma to the hospital, but the hospital would not accept it. *Id.* ¶ 13. Belford subsequently sent Grace an email congratulating him on his Belford diploma. *Id.* ¶ 14; Tab 3 (copy of email from Belford).

### 6. Jerard McMillon

McMillon, a Michigan resident, testified that he conducted a search on the Internet for "high school online diploma" (or words to that effect) from his home in Michigan and was led to Belford's website. McMillon Decl. ¶¶ 1-4. From his Michigan home, McMillon provided his personal information and completed the online equivalency test. *Id.* ¶¶ 5-6. After completing the test, a representative from Belford telephoned McMillon and advised him that all he needed to do to receive a diploma is provide payment. *Id.* ¶ 7. McMillon's mother provided the requested payment and McMillon received a diploma in the mail. *Id.* ¶¶ 8-9; Tab 1 (copy of diploma). The diploma was shipped to McMillon's Michigan home. *Id.* ¶¶ 9-10. Thereafter, McMillon was denied a job position based on his submission of a "fake diploma," or words to that effect. *Id.* ¶ 11.

### 7. William Mazur

Mazur, a Michigan resident, testified that he conducted a search on the Internet for "GED information" (or words to that effect) from his home in Michigan and was led to Belford's website. Mazur Decl. ¶¶ 1-4. From his Michigan home, Mazur created an account on Belford's website, provided his personal information, and took the online equivalency test. *Id.* ¶¶ 6-7. After completing the test, a Belford representative called Mazur on the phone and advised him that all he needed to do in order to receive a diploma is provide payment. *Id.* ¶ 9. Thereafter, Mazur logged

into his Belford account, accessible through Belford's website, and provided payment in the amount of $212. *Id*. ¶ 10. Mazur subsequently received a diploma in the mail, which was sent to his Michigan home. *Id*. ¶¶ 11-12; Tab 1 (copy of diploma).

### 8. Karyn Thompson

Thompson, a Michigan resident, testified that she conducted a search on the Internet for "degree online" (or words to that effect) from her office in Michigan and was led to Belford's website. Thompson Decl. ¶¶ 1-4. From her office in Michigan, Thompson supplied personal information to Belford, including contact information and prior work and educational experience, and paid a fee. *Id*. ¶ 6. Thereafter, Thompson received a number of emails from Belford, including an email confirming her "order" for a "Masters Degree in Business Administration," another two emails confirming payment, and yet another email confirming that her order had been shipped. *Id*. ¶ 7; Tabs 1-3 (copies of emails from Belford). Thompson subsequently received her Belford degree in the mail. *Id*. ¶¶ 10-11; Tab 4 (copy of degree).

### III. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Fed. R. Civ. P. 12(b)(2) authorizes the filing of motions to dismiss for lack of personal jurisdiction. As stated by the Sixth Circuit, when

> [p]resented with a properly supported 12(b)(2) motion and opposition, the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions. The court has discretion to select which method it will follow, and will only be reversed for abuse of that discretion.

*Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citations omitted). A court may opt to permit discovery or convene an evidentiary hearing "[i]f the written submissions raise disputed

issues of fact or seem to require determinations of credibility." *Serras v. First Tenn. Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). When the trial court has determined that the motion to dismiss for lack of personal jurisdiction can be decided upon the written submissions, the plaintiff must only make a prima facie showing that personal jurisdiction exists; if this burden is satisfied, the motion to dismiss should be denied notwithstanding any controverting presentation by the moving party. The trial court must consider the pleadings and affidavits in the light most favorable to the plaintiff. *Id.*

In the present case, the Court resolves Belford's motion to dismiss based on the parties' written submissions alone because the material facts pertinent to the jurisdictional controversy are not in dispute.

## IV. ANALYSIS

In analyzing challenges to personal jurisdiction, courts distinguish between "general" and "specific" jurisdiction. *Third Nat'l Bank in Nashville v. WEDGE Group Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989). General jurisdiction is personal jurisdiction over the defendant to adjudicate claims not necessarily related to the defendant's contacts with the forum state, provided the defendant's contacts with the forum state are of a "continuous and systematic" nature. On the other hand, "[a]n exercise of specific jurisdiction is proper where the claims in the case arise from or are related to the defendant's contacts with the forum state." *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). In the present case, Plaintiffs do not argue that Belford's contacts with Michigan are "continuous and systematic" such that general jurisdiction is proper; rather, Plaintiffs contend only that the Court should exercise specific jurisdiction over Belford.

To determine whether personal jurisdiction exists, federal courts apply the law of the forum

state, subject to the limits of the Due Process Clause of the Fourteenth Amendment. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). Thus, the defendant must be amenable to suit under the forum state's long-arm statute and the requirements of due process must be satisfied. *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994). The Court first addresses whether it may exercise specific jurisdiction over Belford under Michigan's long-arm statute, and then whether the exercise of personal jurisdiction over Belford comports with federal due process requirements.

### A. Michigan's Long-Arm Statute

Under Michigan's long-arm statute, courts may exercise specific jurisdiction over defendants who (i) transact business within the state, (ii) do or cause any act to be done in the state resulting in an action in tort, (iii) own, use, or possess any real or tangible property within the state, (iv) contract to insure any person, property, or risk located within the state, or (v) enter into a contract for services to be performed or for materials to be furnished in the state by the defendant. Mich. Comp. Laws § 600.715.

Plaintiffs argue that provisions (i), (ii), and (v) are satisfied in the present case. The Court agrees with Plaintiffs that, at the very least, Belford clearly transacted business in Michigan and entered into a contract for materials and/or services to be furnished in Michigan when it (i) telephoned Michigan residents, (ii) swayed them to purchase its product, (iii) accepted credit card payment from Michigan residents online and over the phone, and (iv) mailed its diplomas and degrees to Michigan residents at their respective Michigan residences. *See Sifers v. Horen*, 188 N.W.2d 623, 624 n.2 (Mich. 1971) ("the slightest" act of doing business in Michigan satisfies the "transact business" requirement of § 600.715(1)). Accordingly, specific jurisdiction over Belford

is proper under Michigan's long-arm statute.

## B.  Due Process

The Sixth Circuit has articulated a three-part inquiry to determine whether the exercise of

specific jurisdiction over a defendant comports with federal due process requirements:

> First, the defendant must purposefully avail himself of the privilege of acting
> in the forum state or causing a consequence in the forum state.  Second, the
> cause of action must arise from the defendant's activities there.  Finally, the
> acts of the defendant or consequences caused by the defendant must have a
> substantial enough connection with the forum state to make the exercise of
> jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).  The Court addresses each

element, in turn.

## 1.  Purposeful Availment

### a.  Law

The Sixth Circuit has summarized the purposeful availment requirement as follows:

> [The plaintiff] must . . . establish with reasonable particularity sufficient
> "minimum contacts" with Michigan so that the exercise of jurisdiction over
> [the foreign defendant] would not offend "traditional notions of fair play and
> substantial justice."  *Int'l Shoe v. Washington*, 326 U.S. 310, 316, 66 S. Ct.
> 154, 90 L. Ed. 95 (1945).
>
> The minimum-contacts requirement is met if [the foreign defendant]
> "purposely avail[ed] itself of the privilege of conducting activities within the
> forum State."  *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L.
> Ed.2d 1283 (1958).  "Purposeful availment," the "constitutional touchstone"
> of personal jurisdiction, is present where the defendant's contacts with the
> forum state "proximately result from actions by the defendant *himself* that
> create a 'substantial connection' with the forum State," *Burger King Corp.
> v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed.2d 528 (1985)
> (emphasis in original), and where the defendant's conduct and connection
> with the forum are such that he "'should reasonably anticipate being haled
> into court there.'"  *Id.* at 474, 105 S. Ct. 2174 (quoting *World-Wide
> Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S. Ct. 559, 62 L.
> Ed.2d 490 (1980)).  "This 'purposeful availment' requirement ensures that

a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp.*, 471 U.S. at 475, 105 S. Ct. 2174 (internal citation omitted).

*Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002).

The focus of the inquiry is whether the defendant has engaged in "some overt actions connecting the defendant with the forum state." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998). Neither the presence of the defendant in the state, nor actual contract formation within the state is essential to support jurisdiction. *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 907 (6th Cir. 1988). As the Supreme Court instructed in *Burger King Corp.*,

> [j]urisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

471 U.S. at 476 (emphasis in original).

### b. The Parties' Arguments

Relying heavily on the Sixth Circuit's decision in *Neogen*, discussed below, Plaintiffs contend—based on the testimony of the eight declarants, including that of Plaintiff McCluskey—that Belford has purposefully availed itself of the privilege of acting in Michigan because it (i) uses its interactive website to secure business from Michigan residents who respond to its Internet advertising, (ii) initiates phone calls and sends emails to encourage interested buyers in Michigan to purchase its products, and (iii) mails its product to the homes and offices of Michigan residents.

Belford, on the other hand, argues that it has insufficient minimum contacts with Michigan to justify personal jurisdiction. As an initial matter, Belford argues that the seven declarations submitted by non-parties Collins, Russell, Anderson, Grace, McMillon, Mazur, and Thompson are "irrelevant," and should be disregarded, because they are "unrelated to Plaintiff Carrie McCluskey's cause of action, and, therefore cannot support a claim for limited personal jurisdiction."[4]  Reply at 1.

Additionally, Belford points out that its website makes no mention of Michigan and that its relationship with its customers is governed by Panamanian law. Belford emphasizes the declaration of its managing coordinator, Salem A. Kureshi, which states, among other things, that Belford: (i) is located in Panama, (ii) does not operate or have any presence whatsoever in Michigan, (iii) does not specifically target advertising to Michigan residents, (iv) has no banks accounts in Michigan, (v) has no real or tangible property in Michigan, and (vi) has no vendors in Michigan, and (vii) has never directed its employees to travel to Michigan. Belford further emphasizes Kureshi's statement that less than 1% of its students are Michigan residents. Belford relies mainly upon *Campbell v. Bridgeview Marina, Ltd.*, 347 F. Supp.2d 458 (E.D. Mich. 2004*)*, *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293 (6th Cir. 1989), and *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147 (6th Cir. 1997), all discussed below, in support of its argument that its contacts with Michigan are insufficient to justify personal jurisdiction.

---

[4] Following oral argument, the Court issued an order inviting the parties to submit supplemental briefing relating to this argument because it was inadequately addressed by the parties in their initial motion papers. Both sides have filed supplemental briefs. This issue is discussed *infra* at 20-21.

### c. Discussion

The Court agrees with Plaintiffs and finds that Belford has purposefully availed itself of the privilege of doing business in Michigan. The Sixth Circuit's decision in *Neogen* is directly on point and controlling, foreclosing Belford's argument that its contacts with Michigan are insufficient to warrant specific jurisdiction.

The defendant in *Neogen* was a Pennsylvania blood testing business with a physical presence only in Pennsylvania. It was sued for trademark infringement and related wrongs in the Eastern District of Michigan by a Michigan plaintiff in the business of marketing health care products, including diagnostic test kits. About 90% of the defendant's business was generated through established contracts with customers around the world, none of whom was located in Michigan. The remaining 10% of the defendant's business stemmed from customers with whom the defendant had no prior contract. Customers not under a contract obtained the defendant's services by telephoning or emailing the defendant, who would then send the customer a form to complete and mail back. The customer could then obtain test results via mail, or by visiting the defendant's website and logging in using a unique password provided to the customer by the defendant. The defendant's website, which was internationally accessible, provided potential customers with information and allowed them to print forms and log in using a unique password. Customers paid by mailing a check to the defendant's Pennsylvania office. In one year, the defendant performed 14 orders for Michigan customers. The question for decision was whether the defendant's contacts with Michigan through its website and its approximately 14 yearly mail-order transactions with Michigan customers subjected it to specific jurisdiction in Michigan. *See* 282 F.3d at 886-887.

The Sixth Circuit answered this question in the affirmative, holding that

> [the defendant's] contacts with Michigan customers are more than random or fortuitous events. Although customers from Michigan contacted [the defendant], and not the other way around, [the defendant] could not mail test results to and accept payment from customers with Michigan addresses without intentionally choosing to conduct business in Michigan. This establishes that [the defendant] chose to contract with customers from Michigan. Additionally, a part of [the defendant's] service is the packaging of the results of the tests that it performs. When [the defendant] mails these test results to its Michigan customers, or sends them a password to be used interactively on its website, [it] reaches out to Michigan to perform its services there. [The plaintiff] has therefore alleged facts which, when viewed in the light most favorable to [it], support a finding that [the defendant] purposefully availed itself of the privilege of doing business in Michigan.

*Id.* at 892. The court explicitly noted that it was not deciding the issue based on the existence of the defendant's website alone. *Id.* at 890. The court did, however, find that several aspects of the website supported a finding of purposeful availment, such as the fact that Michigan residents were provided passwords to access test results and the fact that the website held itself out as welcoming to Michigan businesses. *Id.* at 890-891.

The similarities between *Neogen* and the present case are stark; the differences, few in number, are unremarkable. Importantly, in both cases, it was the potential customer who first reached out to the defendant, and not the other way around. Yet, the *Neogen* court found the existence of specific jurisdiction over the non-resident defendant based on actions taken by the defendant, and directed toward Michigan customers, *after* initial contact was established. Specifically, after potential Michigan customers established the initial contact, the defendant welcomed and accepted their business, knowing that they haled from Michigan, by (i) sending necessary forms in order to facilitate the transaction, (ii) assigning Michigan customers unique passwords, allowing them to access test results via the defendant's website, (iii) sending test results in the mail to Michigan addresses, and (iv) accepting payment from Michigan customers.

The uncontested declarations of the eight Michigan students in this case reveal that Belford welcomed and accepted their business in many of the ways as did the defendant in *Neogen*. Specifically, the declarations reveal that Belford representatives (i) initiated one or more telephone calls with six of the Michigan-based declarants in order to facilitate the transaction, (ii) assigned a unique password to at least one of the Michigan-based declarants, allowing her personalized access to Belford's website, (iii) sent emails to at least three of the Michigan-based declarants regarding payment issues, promotions, and account information, (iv) accepted credit/debit card payments from five of the eight declarants over the phone, (v) accepted and processed online credit card payments via Belford's website from the remaining three of the eight declarants, and (vi) mailed diplomas/degrees to each of the eight declarants, at their Michigan addresses. Taken together and viewed in the light most favorable to Plaintiffs, the Court finds these purposeful actions, all specifically and consciously directed at Michigan residents, sufficient under *Neogen* to satisfy the purposeful availment requirement under the Fourteenth Amendment.

Not only did Belford welcome and accept the business of Michigan residents in the same manner as did the defendant in *Neogen*, it also actively encouraged their business by taking affirmative steps to entice undecided potential Michigan customers who had not yet paid for their diplomas/degrees. As noted, Belford initiated one or more telephone calls with six of the declarants in order to facilitate the transaction. During these calls, Belford representatives advised the six declarants, who had not yet consummated the sale through payment, that all that was necessary in order to for them to receive a diploma or degree was payment. In particular, Belford put the "hard sell" on Collins, calling her at her Michigan home before she even completed her equivalency test to advise her of a special promotion on diploma pricing. Significantly, there was no evidence of

similar enticement by the defendant in *Neogen*, making the case for specific jurisdiction considerably stronger here.

Belford attempts to blunt the impact of *Neogen* by arguing that it relied on a case that has since been criticized and, alternatively, that *Neogen* is distinguishable from the present case. Both arguments are unpersuasive. The criticized case on which *Neogen* relied is *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). There, the court held whether a business' website subjects the business to personal jurisdiction in a given forum depends on the website's level of interactivity: a website that is "passive" (*i.e.*, merely offers information to the user) would not support jurisdiction while a website that is "interactive" (*i.e.*, allows the user to exchange information with the host computer) would support jurisdiction. *Id.* at 1124-1125. The *Neogen* court did rely on *Zippo*'s "sliding scale" of interactivity framework, at least in part, in concluding that the defendant's website supported a finding of purposeful availment. As Belford correctly notes, *Zippo*'s "sliding scale" framework has been criticized in recent years. *See, e.g.*, *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1219 n.26 (11th Cir. 2009). Thus, Belford argues that the persuasiveness of *Neogen* has been eroded due to its reliance on authority that has since been questioned.

The argument is unpersuasive for several reasons. First, *Neogen* remains good law in the Sixth Circuit because it has neither been criticized nor overruled by the Supreme Court or by a subsequent panel of the Sixth Circuit. Thus, *Neogen* is binding on this Court.

Second, Belford vastly overstates the degree on which *Neogen* relied upon the *Zippo* framework in reaching its conclusion. In reaching its conclusion, the *Neogen* court concentrated on the affirmative actions taken by the defendant, as did this Court in its analysis above, to reach out

to and facilitate business with forum customers. The *Neogen* court did not rely principally on the *Zippo* analysis, which focuses on whether a website is merely passive versus highly interactive as *the* basis for either denying or sustaining personal jurisdiction. The court did note that certain aspects of the defendant's website supported a finding of purposeful availment. However, this analysis of the website—which focused on the degree to which the website allowed forum users to use its services as just one factor (and not *the* factor) in a purposeful availment analysis—is sound, and would very likely remain sound, even if the Sixth Circuit or the Supreme Court eventually sustains the criticism relating to *Zippo*'s "sliding scale" framework.

Belford next argues that *Neogen* is distinguishable from the present case because the defendant's website in that case held itself out as welcoming to Michigan businesses, whereas Belford's website does not:

> [The defendant] . . . posts on its website a chart showing the "results of screening 4,579 infant deaths with unknown cause," including a geographical breakdown of data that expressly includes Michigan. This chart suggests that [the defendant] has used data collected from Michigan residents to complete this study, and holds itself out as having done so.

*Neogen*, 282 F.3d at 891. The chart mentioning Michigan, which was found on the defendant's website, was but one of many factors that led the *Neogen* court to its conclusion that the defendant purposefully availed itself of the privilege of doing business in Michigan. Belford is correct that the same fact is not operative here; however, there are significant facts that exist here—that did not exist in *Neogen*—that support a finding of purposeful availment. One such fact is the manner in which Belford actively encouraged and enticed undecided Michigan customers to proceed with the transaction by persuading Michigan residents that the diplomas/degrees would be accepted by colleges and universities across the country.

Belford believes, incorrectly, that the present case is analogous to decisions such as *Campbell*, *LAK*, and *Kerry Steel*, in which courts found specific jurisdiction over non-resident defendants lacking. The critical difference between those cases and the present case is that the defendants in those cases did nothing to reach out to forum residents to secure or encourage business. In *Campbell*, emergency circumstances (*i.e.*, the breakdown of the plaintiffs' boat at sea) led the plaintiffs to the defendant's boat repair shop in Canada. In *LAK*, the defendant-seller of property did nothing to reach out to the Michigan land-buying market or to secure the sale of his land to a Michigan buyer. In *Kerry Steel*, the coil-buying defendant did not seek out the plaintiff, a Michigan-based seller of coils. In contrast to those cases, Belford took substantial and conscious steps to secure and encourage the business of Michigan residents by reaching out to them through phone calls and email in an attempt to sway them to proceed with a purchase. For this reason, the cases on which Belford relies are distinguishable and not controlling here.

Belford also argues that the Court should not exercise personal jurisdiction over it because it has no physical presence in Michigan, only a small percentage of its business stems from Michigan residents, and its relationship with its customers is governed by Panamanian law. Even assuming these facts to be true, they do not carry the day in light of the analysis above. *See Burger King Corp.*, 471 U.S. at 476 ("[j]urisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State (emphasis in original)); *Neogen*, 282 F.3d at 886-887 (exercising personal jurisdiction over a defendant despite the fact that a very small percentage of its customers resided in the forum state); *Burger King Corp.*, 471 U.S. at 482 (holding that choice-of-law provisions are alone insufficient to establish jurisdiction, although they can "reinforce [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation

there").

Finally, Belford argues that the Court cannot consider its contacts with non-parties Collins, Russell, Anderson, Grace, McMillon, Mazur, and Thompson because any such contacts cannot support a finding of specific personal jurisdiction. As noted in footnote four, the Court requested supplemental briefing on this issue. In their supplemental brief, Plaintiffs point out, correctly, that the Sixth Circuit in *Neogen* expressly considered and relied upon the defendant's contacts with non-parties in finding the exercise of specific jurisdiction over a foreign business proper. *Neogen* involved only one party plaintiff, Neogen Corporation. Yet the Sixth Circuit, throughout the entire *Neogen* opinion, framed its analysis of whether an exercise of specific jurisdiction was proper in terms of the defendant's contacts with Michigan resident*s* (plural), specifically, the fourteen Michigan businesses with whom the defendant contracted in a given year. *See Neogen*, 282 F.3d at 891 (finding that "[t]he district court . . . erred in concluding that the 14 yearly contracts with Michigan customers were insufficient to establish personal jurisdiction over [the defendant]"). Thus, *Neogen* directly supports Plaintiffs' argument that this Court may consider Belford's contacts with non-parties in analyzing whether the Court's exercise of specific jurisdiction over Belford is proper.

On the other hand, in its supplemental brief, Belford cites several cases for the proposition that "a plaintiff cannot rely on acts allegedly perpetrated against other putative class members to establish personal jurisdiction over defendants for her claims." *Matthews v. Brookstone Stores, Inc.*, 469 F. Supp.2d 1056, 1067 n.17 (S.D. Ala. 2007). However, the cases on which Belford relies are non-binding district court cases; *Neogen*, by contrast, is a recent published Sixth Circuit opinion by which this Court is bound. Notably, Belford does not so much as mention *Neogen* in its

supplemental brief. The Court analyzes the present case in accordance with *Neogen*, a binding case in which the defendant's contacts with non-parties were considered and relied upon by the court in the context of a specific personal jurisdiction analysis.

However, even if the analysis of the unanimous *Neogen* court is found to be faulty or if Belford is correct that a defendant's contacts with putative class members cannot be considered, the result reached by the Court today would remain unchanged. This is because Belford's contacts with Plaintiff McCluskey are alone sufficient to support a finding of specific jurisdiction over Belford. As discussed, Belford took affirmative, conscious actions directed at Plaintiff McCluskey to facilitate and secure her business. Belford called McCluskey on the telephone, at her Michigan home, to inform her that she had passed the equivalency test and was therefore eligible to purchase Belford's product. It then swayed McCluskey to purchase its product by telling her that the diploma would be accepted by colleges across the country. It then accepted payment from McCluskey over the phone and shipped its product to McCluskey's Michigan residence. In sum, Belford welcomed McCluskey's business, consciously reached out to her, and used the mail and wire communications to facilitate and complete the transaction. Taking the facts in a light most favorable to Plaintiffs, these purposeful actions directed at a Michigan resident are more than sufficient to support a finding of purposeful availment.

Based on the foregoing analysis, and taking the facts in a light most favorable to Plaintiffs, the Court finds that Belford purposefully availed itself of the privilege of acting in Michigan. Therefore, the first element of the *Mohasco* framework is satisfied.

### 2. Connection Between Belford's Activities and the Present Cause of Action

Under the second step of the *Mohasco* framework, Plaintiffs must make a prima facie

showing that the cause of action arose from Belford's activities in Michigan. In *Third Nat'l Bank in Nashville v. WEDGE Group Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989), the Sixth Circuit reiterated "that the 'arising from' requirement is satisfied if the cause of action is 'related to' or 'connected with' the defendant's forum contacts." The purported class action complaint in this case stems from Belford's alleged sale of sham high school diplomas and university degrees. Some of the alleged victims of the purported scam are Michigan residents. In order to facilitate and complete these sales, Belford reached out to Michigan residents in manner sufficient to satisfy the purposeful availment requirement, as discussed extensively above. As such, the case relates to and is connected with Belford's contacts with Michigan. Thus, the second element of the *Mohasco* framework is satisfied.

### 3. Substantial Connection

Under the final step of the *Mohasco* framework, the acts of Belford must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. "An inference arises that the third [*Mohasco*] factor is satisfied if the first two requirements are met." *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002). Here, taking the facts in the most favorable to Plaintiffs, Belford telephoned six Michigan residents encouraging them to buy its product; it swayed one undecided Michigan resident to purchase a diploma by enticing her with a sales promotion; it sent emails to three Michigan residents; it accepted payment, either by phone or online, from eight Michigan residents; and it mailed its product to eight Michigan residents. Taking the facts in the light most favorable to Plaintiffs, Belford knew it was doing business with Michigan residents, as evidenced by the undisputed facts listed in the preceding sentence. It should not be surprised that it is now being haled into a Michigan court to litigate claims arising from these transactions. There is nothing unreasonable in subjecting Belford to

jurisdiction in Michigan.

* * *

For the reasons stated above, the Court finds that Plaintiffs have established a prima facie case that the Court's exercise of jurisdiction over Belford comports with Michigan's long-arm statute. The Court further finds that Belford has sufficient minimum contacts with Michigan such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice, thereby comporting with due process principles. Accordingly, Belford's motion to dismiss for lack of personal jurisdiction is denied.

## V. PLAINTIFFS' MOTION TO COMPEL DISCOVERY

In their motion to compel discovery, Plaintiffs seek jurisdictional discovery related to Belford's connections with Michigan. Belford resists, arguing that the discovery requested is "abusive" and "unnecessary because the Court can rule on Belford's motion to dismiss without additional discovery." Resp. to Mot. to Compel at 1. Plaintiffs admit that its motion to compel "should be rendered moot by the Court's denial with prejudice of [Belford's] personal jurisdiction motion." Mot. to Compel at 2.

As explained above, the Court has determined that jurisdiction over Belford is proper based on the present record. Thus, Plaintiffs' motion to compel is denied as moot.

## VI. CONCLUSION

For the reasons stated above, Belford's motion to dismiss for lack of personal jurisdiction [docket entry 55] is denied and Plaintiffs' motion to compel discovery [docket entry 99] is denied as moot.

SO ORDERED.

Dated: December 30, 2010          s/Mark A. Goldsmith
       Flint, Michigan                MARK A. GOLDSMITH
                            United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 30, 2010.

          s/Deborah J. Goltz
          DEBORAH J. GOLTZ
          Case Manager